## W. A. PATRICK v. FRANCIS SMITH.

Decided December 10, 1896.

1. **Contract—Assent by ·Acts.**

Where negotiations with reference to a proposed contract, carried on by letter, have arranged most or all of the terms of the agreement, but no final assent has been given, and the negotiations contemplate the making of a formal contract, which never was executed, assent to the contract may nevertheless be evinced by the acts of the parties. See opinion for facts held to present sufficient evidence of assent to a contract by acts to make the question of its acceptance one of fact for the jury. (Pp. 271 to 273.)

2. **Court of Civil Appeals—Jurisdiction Over Questions of Fact.**

The Court of Civil Appeals, where it reverses the judgment of the trial court, because the evidence is insufficient to support the verdict, cannot render judgment for the appellant, as in cases of judgments which there is no evidence to support. It has no power to determine issues of fact in the first instance, and under Revised Statutes, article 1027, must in such case remand to the trial court. (P. 274.)

3. **Jurisdiction of Supreme Court.—Case Reversed and Rendered on the Facts.**

Where the verdict below was not without evidence to support it, but the judgment was, by the Court of Civil Appeals, reversed and rendered for the appellant, the Supreme Court has jurisdiction to revise the decision, though it be not clear whether the reversal proceeded on the ground that there was no evidence, or that the evidence was insufficient; while, in the latter case, the Supreme Court had no power to revise the judgment of the Appellate Court on the facts, it had power to reverse its judgment for the error in law in rendering judgment on a disputed issue of fact, instead of remanding the case as required by the statutes. (P. 274.)

ERROR to Court of Civil Appeals, Fourth District, in an appeal from Bexar County.

Suit was brought by Patrick against Smith & Co. and plaintiff obtained judgment, which, upon defendant's appeal, the Court of Civil Appeals reversed and rendered for appellant. Appellee then obtained writ of error.

*F. M. Boyles* and *Martin & Eddins,* for plaintiff in error.

*N. P. Drought* and *Upson, Bergstrom & Newton,* for defendant in error.

GAINES, CHIEF JUSTICE.—This suit was brought by plaintiff in error to recover of defendants in error and H. P. Drought, as partners under the name of Francis Smith and Company, commissions for negotiating a sale of certain parcels of land under an alleged contract between the parties. Drought pleaded that he was not a partner and was let out of the case. It appears that Smith in transacting the business in question used the partnership name given above. The plaintiff obtained a judgment in the trial court, but upon appeal the Court of Civil Appeals reversed that judgment, and rendered a judgment for the defendant.

The evidence adduced upon the trial shows the following facts: The defendant Smith had a deed in trust with a power of sale upon a large body of lands in Falls County, to secure a debt owed him by the mort-

gagors. The debt had matured, and defendant was proposing a sale of the lands under the power granted in the deed in trust. The plaintiff, who is an attorney-at-law, having been employed by the mortgagor to negotiate an adjustment of the debt and security so as to save them a homestead of 200 acres of the lands, called to see the defendant about the matter. Their conference led to a protracted correspondence by letter, in which the terms of a contract were agreed upon in all the particulars save one, but which, in so far as it expressly refers to the proposals upon either part, fails to show a definite agreement. On August 8, 1890, the defendant, under the name of Francis Smith and Co., wrote to the plaintiff the following: "In this case is there any probability of your selling the land or of us getting the interest? We are preparing to sell the land in October." Again, on August 29, 1890, the defendant wrote to plaintiff: "We are making preparations to sell this land in October, and expect to have our notices out in a few days. I think we had better go ahead and sell; at the same time we will pay you liberally for any sale which you may make, satisfactory to us both as to price and terms of payment. We think you are right to ask that you have a contract, and we will be obliged if you will draft such a contract as you require and send it to us for consideration. If, at any time before the trustee's sale, sales can be made by which Summers can carry the land, we will be glad of it, and will postpone our sale, but in that case your contract will probably be with Summers and not with us, though you may require of us an agreement as to furnishing releases, should you effect sales for Summers." This evidently contemplates an employment by defendant of the plaintiff to make contracts of sale of the lands, the execution of which was to be contingent upon the defendant becoming the owner at the foreclosure sale. To this letter, on September 4, 1890, the plaintiff replied: "Yours of some days ago concerning the Summers matter was received and in reply will say that I think it is best that you sell the land as soon as possible, then I think that the land can be cut and sold. At this time I have opportunities to sell about 1304 of the land, 1204 acres at $15 per acre and 100 acres, all in the woods, at $12 per acre. This morning I received a notice from a party in La. who might take the whole tract, with the exception of small portion which I could sell to other parties, and can get some cash payment on all sales unless it would be the unimproved land, and the parties who would purchase the unimproved land and go to work as soon as the trade could be effected; but what is done ought to be done at once, so it would give purchaser ample time to make crops the coming year. I will want a commission of five per cent and will want the handling of all the lands, and think that I can make sales and cut the land so that there will not be any hard stock left on hand. I do not know what kind of a contract that would suit you, so I would prefer that you draw the contract, and would want the contract allow me the handling of all the lands with a commission of 5 cash commission. All sales to be submitted for your approval, you obligating yourself to accept all sales where they appeared to be

for the interest of the company. * * *" September 6, 1890, in response to the above, the defendant, evidently through his agent, wrote as follows: "In reply to yours of the 4th inst., we have already sent the notices of sale to the sheriff to be posted and we will sell the property in October. We think the five per cent commission which you ask on any sales that you may effect is reasonable enough, and we will be willing to pay it. In regard to allowing anybody else to sell the land but yourself, we think that idea should be considerably modified. We might agree, for a certain length of time, that you should have the exclusive right to make sales, and that on all sales effected during that time you should be allowed a commission, we, of course, agreeing to approve all sales made at a certain sum per acre and on which a certain cash payment had been made, or that if the purchaser places the land in cultivation or a portion of it, that we will agree to make deeds. I do not think that there will be any question between us on these matters, but, as Mr. Smith is conversant with the land and the writer knows little or nothing about it, we have thought it well to forward your letter to him in New York before concluding the contract with you, and on hearing from him we will be able to make definite terms with you. We are also asking him if he can attend the sale, and, if so, he will probably make a contract with you in person." On September 10, 1890, the defendant wrote as follows: "Mr. Drought has forwarded me your letter of 4th. I see nothing unbusiness-like in your proposal, but, as I leave here to-morrow, and as Mr. Drought will be away from S. A. for two or three weeks, you will please write me anything further at Indianapolis, Indiana, corner of Tennessee and Third streets, where I will be at the end of this week, and can prepare the contract. I will go south about 1st of October. * * * * We must see, of course, that the land brings Pr. and Int., taxes and all expenses."

It is clear that, up to this point, there was no mutual assent to all the terms of the proposed agreement. But the correspondence evinces that both parties were willing to agree upon a contract, and that they were ready to concur as to its terms, except as to one or possibly two minor points. But, the correspondence with reference to the contract having dropped at this stage, on September 25, 1890, defendant wrote plaintiff as follows: "We hand you by this post a supply of circulars describing the Summers land. Please get them well circulated. We hope to hear from you by to-morrow regarding sales you had on hand." Again, on the 29th of the same month: "Please let us know by return mail if you have succeeded in effecting trades for the Summers land, whereby you have secured written offers from your clients and oblige." Again, on October 3, 1890: "We will not sell the Summers place on Tuesday next on account of adv. not being published in your paper in time. Sale will come off in November. Please advise us what progress, if any, you have made in securing purchasers for all or portions of the property and oblige." Again, on October 4, 1890: "Yours at hand and contents noted. As we wrote you yesterday sale of Summers place is postponed. How-

ever, let us know as soon as you can the result of your negotiations with the person you have in mind now. Several responsible persons have been soliciting our best terms for the place and the outlook is that more than one party may wish to take the place as a whole." Again, October 6, 1890: "It develops that the printer did not insert the Summers advertisement by one week as soon as we understood he would, and we are therefore advised that the sale on the present notice would not be sufficient compliance with the law to make a good title. The sheriff has therefore been telegraphed to give notice of the postponement of the sale until the first Tuesday in next month. In this connection it occurs to us that, as Mr. Merriweather proposes buying part of the land, and as we understand that Summers will make no objection to the sale, and as it is to the interest of Mr. Merriweather and all concerned to make title to the proposed purchaser as early as possible, with a view to their plans for the next crop, we say that, in view of all this, it has occurred to us that it is possible that Mr. Summers may be willing to make a conveyance of the land, in consideration of his release from all obligation of the debt. Please let us know what you think can be done on this subject. We are aware that, by such a course, we shall lose the trustee's fees, which, however, may be made up by the more satisfactory appearance of the title and the earlier possession of the security." Again, October 11, 1890: "Please advise us what the prospects for a purchaser of Summers' land are and oblige." On the 13th: "You will see that we are proceeding with the Summers sale. Whatever proposals for purchases of the lands you may have, we shall be glad to entertain them when the sale is complete. Our Mr. Smith and Mr. Wallace will be in Marlin at the sale, which will occur on the 4th of November." And again on the 22d of the same month, as follows: "In reply to your favor of the 20th inst., concerning Summers: The time is so short between now and the date of sale that we think it hardly worth while to make any arrangements with Summers, especially as we will be on hand and can make any arrangement we consider necessary, in person. In regard to the sale of the 200 acres, this will be something we will consider when we see you. If we can see our way to realizing our money without touching it, we may waive our lien on it, because it would not be necessary for us to sell it under the deed of trust unless we thought fit to do so. We can leave it for a subsequent sale or foreclosure, but we will talk this matter over with you when we see you in Marlin."

The plaintiff proceeded to make contracts of sale, and, up to the sale on the first Tuesday in November, 1890, the day of the foreclosure, had, as he testified, agreed with third parties upon sales, the purchase money of which amounted to more than $20,000. He also testified in effect that the defendant approved these sales. It is clear, therefore, that there was evidence in this case tending to show that, although the contract of agency was never reduced to writing and signed by the parties, as was contemplated by them in the beginning of the transaction, they both assented to a contract upon the basis of the last letter in relation

thereto, to-wit, that of September 10, 1890. It is evident that the proposed sales were upon the contingency that Smith became the purchaser at the foreclosure sale; and were not to be good unless the purchase of the lands contracted to be sold should be sufficient, together with the land remaining unsold, to pay the debt for which they were mortgaged, the taxes and expenses.

That an assent to a proposed contract may be evinced by the acts of the parties, we have no doubt. In the case of Brogden v. The Metropolitan Railway Company, decided in the House of Lords, the Lord Chancellor said: "There are no cases upon which difference of opinion may more readily be entertained, or which are always more embarrassing to dispose of, than cases where the court has to decide whether or not, having regard to letters and documents which have not assumed the complete and formal shape of executed and solemn agreements, a contract has really been constituted between the parties. But, on the other hand, there is no principle of law better established than this, that even although parties may intend to have their agreement expressed in the most solemn and complete form that conveyancers and solicitors are able to prepare, still there may be a consensus between the parties far short of a complete mode of expressing it, and that consensus may be discovered from letters or from other documents of an imperfect and incomplete description; I mean imperfect and incomplete as regards form." (2 App. Cas., 666.) The case is like that before us. It grew out of proposals for a contract for the delivery of coal by Brogden and Co. to the Railway Company, in which a draft of the agreement, sent by the latter to the former, was approved by Brogden and Co., with one modification, and returned to the Railway Company. This document was received, but no formal assent to the change was ever communicated. Again, it is said in the opinion already quoted from: "Those are the grounds which lead me to think that, there having been clearly a consensus between these parties, arrived at and expressed by the document signed by Mr. Brogden, subject only to approbation, on the part of the company, of the additional term which he had introduced with regard to an arbitrator, that approbation was clearly given when the company commenced a course of dealing which is referable in my mind only to the contract, and when that course of dealing was accepted and acted upon by Messrs. Brogden and Co. in the supply of coals."

The principle upon which this announcement was made is strictly applicable in the present case. The House of Lords there held that the question of the final assent to the proposals was one of fact, and we think it also a question of fact in this case. We merely hold, here, that there was evidence from which the deduction might legitimately be drawn that the parties agreed upon the proposals as modified by the last proposition of the defendant.

The plaintiff and the defendant were both in Marlin, the place of the foreclosure sale, on the day it took place—as each of them testified. As

to what then occurred between them, there is an irreconcilable conflict in the testimony.

In regard to the conversation between him and Smith on that day, the plaintiff testified: "On the morning of the first Tuesday in November, 1890, the day said Summers' land was to be sold, and was sold under the trust deed held by Francis Smith & Co., Francis Smith, Mr. Thompson and O. B. Wallace, the trustee in said deed of trust, all come to my office in Marlin about 9 o'clock in the morning, and, while in my office, I got the same map that I had with me in Waco at the time I met Mr. Thompson and showed to said Francis Smith on the map the various tracts of land I had sold, and told him the number of acres each party had purchased, when Mr. Francis Smith expressed himself to me perfectly satisfied with said sales, and said that the trustee would sell the land early in the day and that, as soon as the sale was made, and if he became the purchaser and owner, that they were going from Marlin to San Antonio, and as soon as he got there they would ascertain the whole amount due, including expenses, and ascertain what the land had to bring, and that he would send a surveyor and have the land surveyed, and as soon as this was done and he got the field notes he would make deeds to the parties to whom I had sold the land, but it would possibly be three or four weeks before this could be done. Francis Smith remained in my office on that morning from about 9 o'clock until 11 o'clock, when the sale was made, and Mr. Thompson and Mr. Wallace were in my office a portion of that time; and about 11 o'clock the sale was made at the east door of the court house in Marlin, and Francis Smith became the purchaser at said sale; and after the sale was made I saw Mr. Smith no more until about 1 o'clock, when I met him coming up Live Oak street in the direction of my office, and he again told me that, as soon as he could have the land surveyed and get field notes, he would make the deeds, but it would be some three or four weeks, possibly, before he could do this." And again, on cross-examination: "I cannot repeat the conversation I had with Mr. Smith in Marlin on the day of sale, but I do know he seemed satisfied with everything I had done, and said that on his return to San Antonio he would have the land surveyed and ascertain the relative proportions of improved and unimproved land, and would figure out the amount due on the loan and see what the land would have to bring. He did not promise me then, that I remember, to pay me my commission, but the letters show that clearly and there was no use discussing it. Five per cent was the amount agreed on. No one, that I remember, gave me the prices or terms on which to sell the land, all Francis Smith and Co. wanted was the amount of the loan, and I think I could have gotten that if the remainder of the land was sold as well as that I contracted to sell. * * *"

In reference to the same matter, the witness Harlan testified, that he went to see Smith on the day of the sale about saving a homestead for the mortgagors, and that Smith told him "that it was his intention to cut the land up and sell it out in small blocks, and try in this way to

make his money out of the land without bothering the homestead. That Mr. Patrick had already contracted portions of it, deeds to be made after sale under deed of trust, if he, Smith, became the purchaser, and that Mr. Patrick had other sales pending, which if carried out, together with the sales he had consummated, would about make the debt due on the land without disturbing the Summers homestead."

On the contrary, the testimony of Smith as to the same subject matter was in part as follows: "That witness had considerable correspondence with Mr. Patrick, or at least his office had, in regard to the Summers land, and they thought he might have a purchaser for it, so they went to see him before making that sale. That they did not go into his office at all, as his office was filled with people. That his conversation with Mr. Patrick was on the outside. That he asked Patrick if there was any purchaser on hand for the Summers property, and he said there was not. That they then walked together over to the court house, to get up a syndicate to buy the property. That he told Patrick all they wanted out of it was their debt, and if they could get that they would be glad to let the property go; that the amount due was about $26,000 or $27,000. That he considered Patrick as representing Summers up to the sale, and after that, if he (Smith) became the purchaser, he would have been willing to have paid Patrick a commission on any sales he made satisfactory to him (Smith), but Patrick never made any. That they could not have sold the land at the prices Mr. Patrick mentioned and got the money advanced out of it."

As before intimated, we apprehend that, under the agreement of the parties as disclosed by the correspondence between them, if ever consummated, the defendants reserved the right to reject any sales that might be contracted for by the plaintiff, provided, in the fair exercise of their judgment, they should conclude that the price was not such that the land unsold would be sufficient to discharge the balance of their debt, or if, for any good reason, the terms or the purchaser were not desirable. This we think a reasonable implication from the correspondence, viewed in the light of the circumstances attending the transaction; and such, indeed, is the construction placed upon the contract by the plaintiff in his petition. He avers that the proposed sales were to be satisfactory to the defendants. The question was, were the sales satisfactory? It is upon this issue that the sharp conflict in the testimony arose. The plaintiff's theory was, that they were satisfactory to Smith, and that he arbitrarily changed his mind and refused to execute the contracts. The plaintiff's evidence tends to support this theory.

In view of the disposition which we shall make of the case, we deem it improper to enter upon any discussion of the testimony. It is not quite clear to us, whether the Court of Civil Appeals intended to hold that there was no evidence upon the decisive issues to support the judgment, or merely that the judgment was against such a preponderance of the testimony that it ought not to stand. But that is unimportant in so far as it concerns the disposition of the case in this court. If the evidence

in a case be conflicting and that court sets aside the judgment upon the facts, we hold their ruling to be conclusive upon us.

There was a conflict of evidence in this case, and the Court of Civil Appeals had the power to reverse the judgment. It was their duty to do so if they thought it against such a preponderance of the evidence that it ought not to stand. Having reversed the judgment we cannot say that they are in error. We have no jurisdiction over that question. Upon it we express no opinion; nor have we come to any definite conclusion upon it. But ought they to have rendered judgment against the appellee? Article 1027 of the Revised Statutes provides, that "When the judgment or decree of the court below shall be reversed, the court shall proceed to render such judgment or decree as the court below should have rendered, except when it is necessary that some matter of fact be ascertained, or the damage to be assessed, or the matter to be decreed is uncertain, in either of which cases the cause shall be remanded for a new trial in the court below." If there be no evidence to sustain a judgment upon an issue material to a recovery, the Appellate Court may in its discretion render judgment for the appellant or remand the cause for a new trial. In such a case this court would probably have no more authority to revise their action than it would have to reverse a judgment of the District Court, merely because in their opinion the ends of justice would be promoted by a new trial. But if the evidence be conflicting, and the judgment be reversed because the verdict of the jury or the findings of the trial court are against the great preponderance of the evidence, we think the only proper course is to remand the cause. Clearly, where there has been a trial by jury, the Appellate Court could not, upon reversal upon the ground stated, render the judgment—because it is such a judgment as the District Court had the power to enter. Its duty, where the verdict is set aside because it is against the great weight of the evidence, is to order a new trial; and, by analogy, it seems that when the Court of Civil Appeals set aside the finding of the trial court for a like reason the cause ought to be remanded. But the statute expressly directs this course "when there is any matter of fact to be ascertained." It is not the province of the Court of Civil Appeals to determine a question of fact in the first instance. Their jurisdiction is to set aside a finding by the court or jury, when contrary to the evidence or against such a preponderance of the evidence that in their opinion it ought not to stand. Railway v. Strycharski, 37 S. W. Rep., 415.

We find no other error in the rulings of the Court of Civil Appeals, but for that here pointed out, their judgment, in so far as it finally disposes of the case, is reversed and the cause remanded.

*Reversed and remanded.*