**KELLY v. PELT.  (No. 6356.)**

(Court of Civil Appeals of Texas.  San Antonio.  Feb. 25, 1920.  Rehearing Denied March 24, 1920.)

1. **Principal and agent** ⊗103(7)—**Authority to sell does not include authority to sell at auction.**

The authority of an agent to sell a tractor, deducible from his possession and efforts to sell it at private sale, does not authorize a sale at auction under rules established by the auctioneer permitting the owner only one bid and requiring him to accept the highest bid however inadequate.

2. **Principal and agent** ⊗19, 119(1), 147(2) —**Persons dealing with agent must ascertain authority and have burden of proof.**

Persons dealing with an assumed agent, whether he be a general or a special one, are bound at their peril to ascertain not only the fact of agency, but the extent of his authority, and in case either is controverted the burden of proof is on them to establish it.

3. **Trover and conversion** ⊗40(4)—**Evidence held insufficient to show conversion.**

In an action for conversion of a tractor purchased by plaintiff at an auction claimed to have been authorized by defendant's alleged agent, who subsequently refused to permit plaintiff to take it, evidence *held* insufficient to show any conversion by defendant.

4. **Auctions and auctioneers** ⊗7 — **Sale of property at auction for inadequate price void for irregularities.**

The sale of a tractor at auction for $500 was void for irregularities where it was worth $1,500, the buyer had attempted to purchase it and knew that the seller was asking that price, the seller had an understanding with the auctioneer that there should be no sale without his presence in person or by agent, and, though it was so announced at the sale, the buyer knew that the seller was not present.

5. **Auctions and auctioneers** ⊗7—**Owner has right to control sale.**

An owner of property sold at auction has a right to control the sale until legally made.

6. **Principal and agent** ⊗103(7)—**Authority to sell cannot be inferred from mere possession.**

While authority to sell personal property may be implied from circumstances, the circumstances must be such as fairly warrant the inference of an authority to sell, and such authority cannot ordinarily be inferred from the mere possession of the property, even though the agent be a dealer in property of that kind.

7. **Appeal and error** ⊗1175(5) — **Judgment rendered on reversal where plaintiff's case cannot be strengthened.**

On reversal of a judgment for plaintiff, where it does not appear that his case could be strengthened on a new trial, judgment will be rendered for defendant.

Appeal from District Court, Hidalgo County; V. W. Taylor, Judge.

Action by Otis S. Pelt against J. C. Kelly and others.  Judgment for plaintiff, and the defendant named appeals.  Reversed and rendered.

L. J. Polk, Jr., of Pharr, and W. H. Lipscomb, of San Antonio, for appellant.

Geo. P. Brown, of Edinburg, for appellee.

COBBS, J.  As appellant's statement of the case is not challenged by appellee, we copy it:

"This suit was instituted by the appellee [who will herein be designated as plaintiff] against F. L. Thomson, W. A. Thomson, and John C. Kelly [the said John C. Kelly, being the only appellant, will be herein designated as defendant], wherein plaintiff sought to recover from the appealing defendant, and the other defendants, damages for the alleged conversion by them of a certain tractor, plaintiff alleging that he acquired title to said tractor by purchasing the same from one J. M. Baden, 'then a duly authorized and licensed auctioneer, acting by due and legal authority as such, and as the agent of the defendants,' who 'sold said tractor to plaintiff at public outcry, and received therefor plaintiff's check for the sum of $500 in full payment.' All of the said defendants answered by, among other pleadings, a general demurrer and general denial.  By the answer of the defendants just referred to they made J. M. Baden and P. H. Faris, the alleged auctioneers, parties defendant, and prayed for judgment against them for such damages as the plaintiffs might be awarded against them.  The court instructed the jury to return a verdict in favor of the defendants F. L. Thomson, J. M. Baden, and P. H. Faris, which was accordingly done, and of which action no complaint is made by either party to this appeal.  The court submitted the case to the jury on special issues; Nos. 2 and 3 being the only ones pertinent to this appeal.  In answer to special issue No. 2 the jury found that the actual or real value of the tractor in question on or about the 17th day of August, 1918, was $1,500, and in answer to special issue No. 3 they found that defendant John C. Kelly had 'prior to the 17th day of August, 1918, authorized his codefendant, W. A. Thomson, to sell or dispose of the tractor in question.'

"On the findings mentioned the court entered judgment in favor of the defendants F. L. Thomson, J. M. Baden, and P. H. Faris, but rendered judgment in favor of the plaintiff against the defendants John C. Kelly and W. A. Thomson for the sum of $1,500, with 6 per cent. interest from August 17, 1918."

The first error assigned is:

"The court erred in overruling, and in not sustaining, this defendant's motion to instruct the jury to return a verdict in his behalf."

The first proposition under it is that only such authority may be implied as is reasonably necessary and proper to carry into effect the main powers conferred.

The question is as to the power of W. A. Thomson, as an alleged agent in possession, to authorize the auctioneer to sell the prop-

erty of Kelly at an auction sale under his agency, and the brief treats largely of the question of agency. To determine whether the charge was a proper request for an instructed verdict, it is necessary to consider all the testimony. The important question is to determine what was the authority of the auctioneer to make the sale.

Mr. Baden, the auctioneer, says on the 17th day of August, 1918, he made a sale of two Emerson-Brantingham 20–40 tractors by the authority of W. A. Thomson. He said:

"Those tractors belonged to Thomson and Kelly. I can tell better how I came to sell these tractors if I may start at the beginning. Mr. Faris and myself talked it over quite a while about starting these sales and conducting them once a month, and we finally decided on the second Saturday of the month. I don't remember whether the first one was held on the second Saturday, but I think it was, and we set the day and solicited all the merchants and farmers we could see. We knew there would not be very much at the first sale, but we thought we could make a success of them and get them advertised. We got a few different articles listed, and we went down to the post office together, and Mr. Faris got his mail and went out and sat down, and I sat there, and he was reading his mail, looking over his mail, and Mr. Thomson was in the post office at the time, Mr. W. A. Thomson, the one present here, and I said, 'Mr. Thomson, you have some wagons for sale over here?' I and my brother had just bought a wagon a short time before belonging to Thomson and Kelly. And he said, 'No; we have not.' I told him about this sale we were getting up, and he said, 'Well, you are just in the nick of time; I have two Emerson-Brantingham tractors, big fellows; they have to be sold, and I will put them in at this sale.' I said, 'I don't know very much about tractors, but maybe we can sell them;' and he said, 'How about it? I think I have the right to bid on them;' and I explained to him that at an auction sale the owner had the right to one bid, that either himself or his agent could have one bid, but one bid was all, and that after that bid, if anybody raised it, why they got the tractors, and I explained it to Mr. Thomson; and he said, 'Will I have to look after it?' and I told him not necessarily, that he could send an agent, and he asked me if I could look after it for him, and I told him 'No, sir;' that my business was selling; that I had the right to bid, but I never did it; that I didn't like to work against any party bidding; that the owner had the right to one bid, or could have his agent make his bid; and he said, 'Well, I will just look after it myself, and if I am not there I will have somebody else there.' We made a special trip to the printing office to have the tractors included in the bills; I had the copy all ready, and had it changed to include the tractors in those bills. The next Saturday I handed Mr. Thomson one of those bills, and showed him where the tractors were on it, and he said, 'Good.' That is one of the bills, and here are two tractors on it (indicating). I talked to Mr. Thomson about it and showed it to him on the bills. He did not at that time nor at any time subsequent to that time tell me not to sell those tractors.

I asked Mr. Thomson if he would demonstrate the tractors and show that they were all right, and he said, 'No; my demonstrator is not here, but I will absolutely guarantee them to be in first-class condition.' And I told him then we would sell them where they were, and he said, 'Yes; sell your other stuff over here, and then when you sell the stock you can sell the tractors.' When I sold the stock I sold the tractors. ` The crowd had to move possibly as far as across the room. I sold the tractors to Mr. Pelt and Mr. Post. I got $500 each for the tractors. I didn't receive the money; didn't take any of it; the clerk took care of that. The acting clerk was Mr. Faris. I saw Mr. Thomson at the sale. My brother, father, Mr. Pelt, Mr. Post, and Mr. De Witt were present with me when I saw Mr. Thomson after the sale. I saw him out where the tractors were, out by the stockyards. Mr. Thomson seemed to be very much worked up, and he said so much; anyway, he said that anybody will make a mistake, and that he had slopped over, and he tried to get these men to take their checks back in my presence. I do not know what became of the tractors after that. I know they are not still there. Mr. Thomson said that anybody taking the tractors would take them over his dead body. Mr. Cage was in the back of the post office at the time of the conversation I have detailed which took place down at the post office. Mr. Thomson and I were present, and Mr. Faris was sitting out in front. Nobody but me and Mr. Thomson were present; Mr. Cage was in the back of the building, talking over the telephone. Mr. Thomson did not at any time tell me not to sell those tractors unless he was there, or had a representative there; he told me to sell them. At the time I sold those tractors, right there on the auction grounds, I made the statement that I always make at sales of this kind; I go right ahead and sell everything to the highest bidder; don't make any difference what it is, it goes. At that time I didn't know what price Mr. Thomson had put on those tractors, and he never told me; just said to leave that to him; that he would look after it or have some one to. I made the statement there that Mr. Thomson himself, or Mr. Thomson's agent, would have a bid on the tractors. I thought Mr. Pelt was buying it for Mr. Thomson; I was a stranger there myself. I didn't know Mr. Pelt, and didn't know but that he was the agent of Mr. Thomson. Mr. Thomson, in his conversation with me, didn't put any price on the tractors; just said leave it to him; said he would be there to look after it himself or have somebody there. He didn't tell me who he would have there."

## The plaintiff, Otis S. Pelt, testified:

The auctioneer "announced that the tractors were there to go to the highest bidder, and Mr. Thomson, he presumed, had some one there to protect the tractors; that they were going to the highest bidder, and he presumed Mr. Thomson had some one to look out for them; that Mr. Thomson hadn't given him any bid. He put the tractors up to the bidders, and Mr. Post bought the first tractor; there were several bids on it. I bought the second tractor; I wrote out a check for the tractor and gave it to the clerk, Mr. Faris. The check was for $500. The tractor that I bought was in front

of and a little east of the power plant, the old elevator and the power plant—it is the old one now—on the south side of the switch. It was an Emerson 20—40 big tractor, and the auctioneer said Mr. Thomson had guaranteed it to be in perfect condition. I did not take the tractor away after I gave the check to the clerk; I gave him the check and went over to the hotel. Mr. Thomson was sitting on the hotel gallery reading a newspaper. I told him. I had bought the tractor. He got up and walked over to where Mr. Baden and his father and brother and Mr. Faris were in a car, and they talked a few minutes, and Mr. Post and myself were talking to some fellow from San Juan—I don't know what his name is; he is in France now—and Mr. Thomson came up with the check in his hands. Mr. Thomson, he had both the checks in his hand, and Mr. Baden said, 'Well, boys, I am a licensed auctioneer; I would turn the tractors over to you, but there has been a mistake made some place,' and Mr. Post spoke up and said, 'Who made the mistake?' and Mr. Baden said, 'Mr. Thomson did.' He [Thomson] took the checks and walked up and said, 'Yes, boys; I thought you were good friends of mine, good, honest fellows, and good friends of mine.' He said, 'It hasn't cost you anything; come and take a drink.' Mr. Post said he had been after a chance to get even with Kelly for so long a time, I don't know how long he said, and Thomson said, 'Kelly hasn't got anything to do with these tractors; they are mine;' and I said, 'Thomson, what are you talking about?' and he said, 'They are mine; they don't belong to Kelly, and he hasn't anything to do with them;' and he then spoke to Post, and said he would tell him some way he could 'gig' Kelly for $1,000 or $2,500. The last I saw of the check Mr. Thomson had it going across the railroad track towards town. We told Mr. Thomson we were going to get the tractors, and he said he would guard them with a shotgun. We told him we wanted the tractors, and he said he would guard them with a shotgun. We went over next day, and he had some parts taken off of them. Post and I went over the next day; we would have gotten the tractors, but the carburetor and clutch and a whole lot of stuff was taken off of them and they were disabled. We didn't try to move them that afternoon, but the next day we went over, and they were disabled, parts taken off of them, the next morning. Thomson said he would guard it [the tractor] with a shotgun. Before the sale, this auction, I had a conversation with Mr. Thomson here about that tractor. I tried to buy the tractor two or three times, and couldn't buy it. One morning, or evening, I don't remember what time it was, just as soon as those handbills were out, I walked in the post office and was looking at some other sales advertised between Pharr and Donna, near Donna, and Mr. Thomson had one of these handbills, and he said, 'Did you see our sale?' and I looked at it—it was the first one I had seen—and it had the two tractors on it, and I told him I would buy one of them if they went right, and he said, 'Don't worry your head about that, old kid,' or 'old chap'; I think he said 'old kid.' I saw that paper (indicating handbill hereinafter referred to) at the time; Mr. Thomson and I were looking at it. That paper mentions two Emerson 20—40 tractors, and that was the paper he had in

his hand. I saw other bills like that scattered around there."

He stated he did not see Mr. Thomson at the sale.

To establish agency appellee introduced in evidence part of appellant's pleading, to wit:

"Further answering said petition, should further answer be required, these defendants say that defendant John C. Kelly, on or about the 17th day of August, 1918, was the owner of said tractor described in said petition, and that these defendants were in possession thereof, the said John C. Kelly as the owner, and the said W. A. Thomson as his agent."

The plaintiff further testified:

"I had a conversation with Mr. Thomson here before that auction sale, and tried to buy a tractor. I didn't buy it then because he wanted all cash. He wanted $1,500. I knew when I was at the auction sale that Mr. Thomson had asked me $1,500 for one of those tractors; at the time I was talking to him I didn't know the auction sale was contemplated. I talked with him two or three or four times, scattered along; must have been three or four weeks before the auction sale. Talked to him that time in the post office when he called my attention to it. I didn't try to buy it then; I told him I would buy one if they went right, and he said, 'Don't worry your head about that, kid;' so I didn't worry. The sale started in the main road right by the side of the park. These tractors were sold over there by the side of the power plant or old elevator that Mr. Thomson has charge of, or did have charge of. I would judge that is about 190 or 200 yards from the park. A pretty good crowd was present at the tractor sale; I don't remember who all was there; Mr. Castro was there and several farmers. I don't remember them because I didn't pay any attention to who they were. I didn't see Mr. Thomson there. The tractors didn't have any chains on them at the time; they did the next morning. * * * At the time I had the conversation with Mr. Thomson, when he had the circular in his hand, he didn't say the tractors were his or the people he represented. He said, 'You see the sale?' and I read it and noticed those two tractors, and I said, 'I will buy one if they go right,' and he said 'Don't worry your head about that, kid.' Prior to that time we had quite a little talk, and he wanted to sell them to me; he told me he wanted to sell his and turn Kelly's over to him, and he told me how he had worked on the wagon proposition, and got his wagons off his hands and left Kelly's."

There is no statement from any witness that shows they were dealing with W. A. Thomson other than as principal and owner of the tractors and acting solely for himself in directing the sale.

The court directed a verdict for all the defendants except John C. Kelly and W. A. Thomson, and in question No. 3 to the jury they were asked to "say whether or not the defendant John C. Kelly had at any time prior to the 17th day of August, 1918, authorized his codefendant W. A. Thomson to sell

or dispose of the tractor in question," and the jury answered "Yes."

[1] There was no express authority shown authorizing W. A. Thomson to sell the machines. If there was any at all from which it could be implied, it was based upon his naked possession and efforts he made to sell at private sale. If that be a proper deduction of authority, then it would not have authorized the sale made by the auctioneer, as said in Lincoln v. French, 105 U. S. 614, 26 L. Ed. 1189. "When facts appear, presumptions disappear." See, also, 2 Mechem on Agency, 731 to 740, as follows:

"No agent has authority to be in all respects and for all purposes an alter ego of his principal, binding him by whatever the agent may do in reference to any subject whatever; and therefore the agency must be special so far as it is limited by place or time, or the extent or character of the work to be done. The general agent therefore binds his principal when, and only when, his act is justified by the authority conferred upon him. * * *"

[2] There was no evidence whatever expressed, or from which it may be legitimately inferred, that W. A. Thomson, as his agent, had the power and authority to pass such power over to the auctioneer to sell in the manner stated. Such a sale is quite different from the ordinary way in which agents are permitted to make sales for their principals. For instance, when property was placed in the hands of this auctioneer for sale, it was to be sold under rules established by him whereby owners were permitted to bid only once at the sale of their own property. The control of his property thus was lost to a certain extent, and he was compelled to accept the bid made, however inadequate it might be, after the one made by him. It was not shown, nor undertaken to be shown, that appellant knew of the contemplated auction sale of this property, or the rules of the auctioneer. It was always treated as the property of W. A. Thomson, and no one ever approached Kelly in reference thereto. If Thomson was acting as his agent, then, as said by the late Justice Neill in the case of Baker v. Kellet-Chatham Mach. Co., 84 S. W. 661:

"Persons dealing with an assumed agent, whether the assumed agent be a general or a special one, are bound, at their peril, to ascertain not only the fact of agency, but the extent of his authority; and in case either is controverted the burden of proof is upon them to establish it. Rice v. Peninsular Club, 52 Mich. 87, 17 N. W. 708; Reitz v. Martin [12 Ind. 306], 74 Am. Dec. 215; Snow v. Warner, 10 Metc. [Mass.] 132, 43 Am. Dec. 417; Beringer v. Meanor's Adm'r, 85 Pa. 223. * * * It rests with the principal to determine what character he will impart to his agent, and, having determined and imparted the character, he is held to have intended also the usual and legal attributes of that character. Mech. Agency, 278."

It was shown by the testimony of the auctioneer and his declaration at the time of the sale that W. A. Thomson was expected to be there or to have an agent present. Appellee knew he was not there. He knew him personally and did not see him there. He went to the hotel afterwards and saw Thomson sitting on the gallery reading a newspaper, and Thomson promptly and immediately repudiated the sale, upon the first opportunity, and said the property belonged to him, and appellee should not have it. There was no proof that Kelly authorized that sale of the tractors. As said in Towle v. Leavitt, 23 N. H. 360, 55 Am. Dec. 195:

"But it appears to the court that there is one point that must settle the case for the plaintiff. This carriage was sold at auction, and this we think must be regarded as exceeding any authority or instructions given that could bind the plaintiff. The defendant, knowing the property to be the plaintiff's, or, if he did not know it, the situation of the property being such as render it incumbent on him to make all necessary inquiries, he was bound, on seeing it exposed to sale in an unusual manner, to inquire as to the right of Lane thus to sell it. Had he done this, probably all difficulty would have been avoided. * * * Nothing was said about Lane's selling at auction, and no inquiries made in regard to it. A sale at auction implies a sale at any price that may be offered. It is ordinarily the last resort to reduce property into money, and we should be slow to ratify the doings of an agent clothed with the usual powers of sale, who should pursue such a course."

And the sale was held to be void.

[3-6] Appellee had repeatedly attempted to purchase the tractor from W. A. Thomson, who refused to sell it for less than $1,500. The proof showed that sum to be its market value. This suit is for conversion of the property predicated upon his alleged title acquired thereto at the auction sale. There is no evidence whatever that Kelly converted them, but, on the contrary, the proof shows they were in W. A. Thomson's possession and carried off by him. The only evidence on the subject of conversion is from appellee:

"That tractor was moved away, loaded on a flat car. I don't know where it went to. Ray Bever did the loading; Mr. Thomson had it loaded, so I was told. It was loaded on a car right there by the side of the garage, and I saw Mr. Thomson overseeing it; he was on the job. I don't know where it was moved to. Mr. Thomson was present when it was loaded. It is not where it was when I bought it; we agreed to leave it there, but he broke his agreement. I have never received the proceeds of that check I put up; I don't know where that money is now."

There is no evidence in the case showing any interest Kelly had in the machine other than the declaration of W. A. Thomson, testified to by him without the presence of Kelly, and of that portion of the pleading introduced by appellee himself showing Kelly the owner

and W. A. Thomson the agent. That does not prove that Thomson was authorized to sell the property through the auctioneer. Even if the auctioneer had been authorized by Thomson to make the sale, it was not made in accordance with the instructions. Thomson had it understood, in effect, there should be no sale without his presence in person or through an agent, which the auctioneer must have understood, for he publicly announced it when making the sale. The appellee knew he could not buy the tractor from Thomson for $500, for it had never been offered to him at less than $1,500. He knew immediately thereafter it could not be purchased for that price, for the sale was repudiated as unauthorized when brought to Thomson's knowledge. It was sold for a sum he knew to be greatly inadequate to its true value, which on account of the irregularities made it void. The sale was void, and appellee took no title thereunder. As said in Lee v. Railway, 22 Tex. Civ. App. 503, 55 S. W. 976:

"The sheriff was notified by plaintiff that it desired to have some one on the ground to bid at the sale."

And it was set aside.

They knew Thomson desired to be there or to have an agent to make a bid if necessary. The sale was made without his presence or further direction. The owner of property at such sales, just like plaintiffs in execution, have the right to control them until legally made. There is nothing in this record to show that Thomson, if the agent, was clothed with such extraordinary powers as to have the property sold in the manner it was. As said by Mechem on Agency, vol. 1 (2d Ed.) § 848:

"Authority to sell personal property need not be conferred in any particular manner. It may, of course, be expressly conferred, but it may also be implied from circumstances. Where the authority results from construction, or is deduced from circumstances, the circumstances must be such as fairly to warrant the inference of an authority to sell. Such authority, however, cannot ordinarily be inferred from mere possession of the property, even though the agent be a dealer in property of that kind, but the principal must have done something more; he must have so acted as to clothe the agent with apparent authority to sell, or must have conferred upon him or permitted him to assume the apparent indicia of ownership."

Whether or not Thomson may be treated as the owner of the property, the undisclosed agent, or that he alone converted it, or that he authorized the sale without authority, or kept the $500 check not shown to be cashed, there is a judgment against him from which he did not appeal, and it is not necessary to discuss that judgment as relating to him.

We sustain the assignments.

[7] From an examination of the record by us we fail to find any testimony upon which a recovery can stand against appellant, and it does not appear to us that it could be strengthened by appellee if returned for a new trial. In such cases it is proper to reverse and render the judgment that should have been rendered below. Patrick v. Smith, 90 Tex. 274, 38 S. W. 17; Maverick v. Routh, 7 Tex. Civ. App. 669, 23 S. W. 596, 26 S. W. 1008; Anderson v. Walker, 70 S. W. 1003; Baggett v. Sheppard, 110 S. W. 952.

The judgment is reversed, and here rendered in favor of appellant.